O/JS-6

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| William F. Whalen,<br><br>   Plaintiff,<br><br>   v.<br><br>Standard Insurance Co. and Pacific Life Insurance Co. Long Term Disability,<br><br>   Defendants.<br>_____ | CASE NO. SACV08-0878 DOC(MLGx)<br><br>**O R D E R** FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The Court conducted a one day bench trial on August 18, 2009. Defendants and Plaintiff filed trial briefs and supporting exhibits and both parties filed supplemental briefing, including Revised Proposed Findings of Fact and Conclusions of Law, on August 25, 2009. At the Court's request, the parties also filed supplemental briefing regarding the standard of review on August 25, 2009, and the Court also entertained additional supplemental briefing regarding the standard of review, which Defendants filed on September 17, 2009, and Plaintiff responded to on September 22, 2009. Having considered the submissions by the parties and all admissible evidence, the Court hereby enters its Findings of Fact and Conclusions of Law in conformity

with Federal Rule of Civil Procedure 52.

**FINDINGS OF FACT**

Policy

1. The policy at issue in this case is Standard Insurance Company Group Long Term Disability Policy No. 642193-B ("LTD Plan"), which Defendant Standard Insurance Company ("Standard") issued to Pacific Life Insurance Company ("Pacific Life"), effective January 1, 2006, as amended from time to time. [Administrative Record ("AR") 09.]

2. William Whalen ("Plaintiff") was employed by Pacific Life for over twenty-eight years, since 1979, and was an LTD Plan Participant. [AR 585.]

3. The LTD Plan is an employee health and welfare long-term disability benefit plan.

4. Standard also evaluated Plaintiff's eligibility for benefits pursuant to his Short Term Disability Policy.

5. Standard was the administrator of the Short Term Disability Policy.

6. Standard acted as the adminsitrator and, pursuant to the Plan's Insuring Clause, payor of the LTD Plan. [AR 16.]

7. Plaintiff's claims for short-term and long-term disability benefits were decided by Standard concurrently. [AR 107.]

8. Standard acted as both a claims decider and a claims payor for Plaintiff's disability claims.

9. The "Allocation of Authority" section of the LTD Plan provides Standard the authority to administer claims: "[W]e have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." [AR 32.] According to the Policy, Standard's authority includes, but is not limited to, the right to resolve all matters when a review has been requested; the right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it; and the right to determine eligibility for insurance, entitlement to

benefits, the amount of benefits payable; and the sufficiency and the amount of information it may reasonably require to make these determinations. [AR 32-33.] The Allocation of Authority provision concludes that "[s]ubject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding." [AR 33.]

10. The LTD Plan states that a claimant must submit satisfactory proof of disability to Standard. [AR 30.] To be considered "disabled" the LTD Plan states that a claimant must be unable, "as a result of Physical Disease, Injury, Pregnancy, or Mental Disorder . . . to perform with reasonable continuity the material duties of [his] Own Occupation." [AR 20.]

11. "Own Occupation" is defined as "any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation [a claimant is] regularly performing for [the claimant's] Employer when Disability begins." [*Id.*]

12. Material Duties are defined by the LTD Plan as those "essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation." [AR 21.]

Condition for which Disability Claimed

13. On July 7, 2006, Plaintiff was involved in a serious traffic accident. [AR 442.] He was waiting at a traffic light, but when the light changed to green the car in front of him failed to move. A driver approaching at high speed from the rear did not notice that the cars at the light hadn't moved. He slammed into Plaintiff's car from behind at 45 miles per hour. [AR 443.]

14. Following the accident, Plaintiff went to a hospital where he was given x-rays and treated for pain in his neck, back and ribs. [AR 298, 337.]

15. Following the accident, Plaintiff returned to work and remained at work through May 2007.

3

16. Plaintiff initially consulted a chiropractor, Dr. Douglas Di Siena, on July 19, 2006. [AR 786.] Dr. DiSiena conducted muscle tests showing "a relative loss of strength in the right deltoid [i.e. shoulder muscle] and right pectoralis [i.e. chest muscle]." [AR 314.] Dr. DiSiena also noted that Plaintiff had loss of movement in his cervical spine. [*Id.*]

17. Dr. Di Siena treated Plaintiff for several months after the accident. Dr. DiSiena's Final Report noted that Plaintiff's prognosis "remains poor at this time." [AR 316.] He also observed that Plaintiff "truly benefited from the chiropractic and additional ancillary care we provided to him." [AR 317.]

18. Plaintiff also consulted Dr. John Dorsey, an orthopedic surgeon, at Dr. DiSiena's referral. Dr. Dorsey examined Plaintiff on August 2, 2006. [AR 870.] During this examination, Dr. Dorsey documented that Plaintiff made no complaints of pain on palpation of the cervical spine or paracervical musculature. [AR 872.] Dr. Dorsey also commented that "[r]ange of motion of the cervical spine is within normal limits without complaints of pain." [*Id.*] Upon examination he had a normal range of motion with complaints of pain at the limits of motion. [*Id.*]

19. Plaintiff consulted with another orthopedist, Dr. Daniel Capen, on August 18, 2006. Plaintiff reported aching-to-sharp pain in his cervical spine with pain radiating through his shoulders, extending to his upper arms, as well as numbness in the left arm extending into his left index finger and left thumb and pain in his neck radiating to the back of his head. [AR 299]. Dr. Capen observed Plaintiff to have a normal gait with no deformity of the spine, although he noted limited range of motion in the cervical and lumbar spine and that Plaintiff's paraspinal muscles were tender. [AR 300.] X-rays of the cervical spine showed some narrowing at C6-7, and x-rays of the lumbar spine revealed a very slight scoliosis. [AR 302.] Dr. Capen ordered MRIs of Plaintiff's spine and prescribed pain medications, anti-inflammatories, and muscle relaxants. [AR 302-03.]

20. Plaintiff had MRIs of his cervical and lumbar spine taken on August 24, 2006. [AR 304-12.] The MRIs showed disc desiccation through the cervical spine, osteophytes at C4 through C7, C5-6 and C6-7. [AR 304.] The MRIs also showed disk protrusions in the

|   |     |     |
|---|-----|-----|
| 1 |     | lumbar spine in L2-3, L3-4, and L4-5. [AR 308.] |
| 2 | 21. | In December 2006, Plaintiff saw a neurologist, Dr. Kirkorowicz, who recommended patient avoid all physical and emotional stress. [AR 354-59.] |
| 4 | 22. | Plaintiff also saw a pain specialist, Dr. Clifford Bernstein, in January of 2007. Dr. Bernstein utilized epidurals and nerve blocks in an attempt to alleviate the pain, but Plaintiff's pain was not relieved through this treatment. [AR 336.] |
| 7 | 23. | In March of 2007 Plaintiff consulted with a second neurologist, Dr. Michael Mahdad. At that point, Plaintiff was suffering from constant neck pain which "becomes very sharp and very painful and [] will start to radiate down into the left arm–associated with numbness & paresthesia." [AR 346.] Dr. Mahdad diagnosed Plaintiff with "[c]ervical sprain/strain associated with left cervical radicular symptoms" and "[l]umbar sprain/strain associated with abnormal MRI scan." [AR 347.] |
| 13 | 24. | Dr. Mahdad ordered an EMG and nerve conduction study, which Plaintiff underwent on April 3, 2007. [AR 349-51.] According to Dr. Mahdad, results of the tests revealed changes "suggestive of left C6 cervical radiculopathy, mild in degree electrically." [AR 350.] |
| 17 | 25. | Plaintiff saw Dr. Capen again on April 16, 2007. [AR 283.] Plaintiff and Dr. Capen determined that Plaintiff should cease working. [*Id*.] Dr. Capen and Plaintiff discussed that Plaintiff would begin to wean his hours and would take off work completely in the next two to three weeks. [*Id*.] Dr. Capen completed a Doctor's Certificate on Plaintiff's behalf for California State Disability on May 7, 2007. [AR 369.] Dr. Capen stated that Plaintiff suffered from a sprain of the cervical spine and a brain injury and that Plaintiff suffered from pain and discomfort. [AR 369.] |
| 24 | 26. | Dr. Capen took Plaintiff off work as of May 16, 2007. [AR 123.] |
| 25 | 27. | Plaintiff visited Dr. Jon Biorkman, a family practitioner, on June 26, 2007 and July 10, 2007. [AR 529-38.] |
| 27 | 28. | Dr. Biorkman completed an Orthopaedic Questionnaire on July 17, 2007, which was transmitted to Standard on August 2, 2007. Dr. Biorkman opined that Plaintiff had pain |

|   |   |   |
|---|---|---|
| | | in his cervical spine, and radicular sensory disturbance in his left leg and arm. [AR 177.] Dr. Biorkman stated the disease was confirmed via objective testing, specifically x-rays, MRI, an abnormal EMG and an abnormal nerve conduction study. Dr. Biorkman stated that all of these tests "correlate[d] with the clinical findings" and that Plaintiff's back condition would limit him to one hour of sitting, two of standing and one of walking during an eight hour day. [AR 178.] Dr. Biorkman stated the anticipated return to work date was "undetermined at this time," with an estimated date of November 11, 2007. [AR 179.] |
| | 29. | Standard received a second Questionnaire on September 6, 2007, this time prepared by Dr. John H. Stasiewitz. [AR 188-190.] Dr. Stasiewitz stated that Plaintiff suffered from spinal pain, as well as a sensory disturbance in his left arm and left leg. [AR 188.] He stated that the spinal condition was confirmed by MRI. And he opined that, due to his back injury, Plaintiff was limited to one hour sitting, two hours standing, and one hour walking in the course of an eight hour day. [AR 189.] |
| | 30. | On July 24, 2007, Plaintiff went for a consultation with Dr. Farzad Massoudi, a neurologist. Dr. Massoudi said that Plaintiff "presents with signs and symptoms of left C6 radiculopathy and persistent and worsening symptoms of neck and back pain and intermittent symptoms of left lower extremity radiculopathic pain." [AR 274.] |

Claims Process and Evaluation

|   |   |   |
|---|---|---|
| | 31. | On June 15, 2007 Standard approved the claim for payment for STD benefits. [AR 147.] However, on July 19th, Standard informed Plaintiff that his claim would be terminated as of July 29, 2007 "because your doctor has given an estimated recovery date" for return of work as of July 29, 2007. [AR 172.] On August 7, 2007, Standard briefly reopened the STD claim, but stated in the same letter that no benefits would be paid beyond September 5, 2007 "because the medical information we have in your file does not provide us with documentation that your present medical condition will be disabling beyond" September 5, 2007. [AR 181.] |
| | 32. | Standard performed an evaluation of the material demands of Plaintiff's occupation. |

33. As of July 2006, Plaintiff held the position of Corporate Travel Manager at Pacific Life. His responsibilities included administering Pacific Life's corporate travel program; managing the travel agents that worked under contract with Pacific Life; negotiating and contracting with travel vendors; running Pacific Life's Corporate Credit Card Program; and serving as Security Administrator for Pacific Life's Wire Transfer Systems. [AR 585.] In addition, Plaintiff was responsible for coordinating special events for high level company executives. [*Id.*]

34. Standard determined that, according to the Dictionary of Occupational Titles ("DOT"), Plaintiff's occupation most closely matched that of a management analyst. [AR 390-94.] A management analyst is a sedentary strength level occupation with physical demands that include occasional reaching, handling, fingering, and frequent talking, and hearing. [*Id.*]

35. As of August 7, 2007, no review had been completed of the claim by any physician employed by Standard.

36. Plaintiff appealed the denial of his claim.

37. On October 11, 2007, Dr. Joseph Mandiberg, a Standard consulting physician, conducted a file review of Plaintiff's claim. [AR 414-423.] Dr. Mandiberg is a Board Certified Orthopedic Surgeon.

38. Dr. Mandiberg did not personally examine Plaintiff nor speak to any of Plaintiff's examining physicians.

39. Dr. Mandiberg reported that "[t]he claimant has what appears to be a C6 radiculopathy on clinical examination and on EMG," but also found that Plaintiff's MRI scans did not show a nerve root compression. [AR 416, 422]. Dr. Mandiberg stated that Plaintiff was working up until May 15, 2007, and there was nothing to substantiate the reason why he could not work after that point, observing that it did not appear that Plaintiff's symptoms were significantly worse. [AR 416.] Dr. Mandiberg stated that Plaintiff's "medication information does not support a change in his work capabilities." [AR 422.] Dr. Mandiberg stated Plaintiff's chart did not substantiate any limitations preventing him from

|   |   |   |
|---|---|---|
| 1 |  | working. *Id.*  Dr. Mandiberg also recommended that Plaintiff's work station be evaluated |
| 2 |  | for an ergonomic arrangement.  [AR 422-23.] |
| 3 | 40. | Dr. Mandiberg also noted that he needed "further information from the neurosurgeon" to |
| 4 |  | determine a reasonable duration of impairment and that Standard should "obtain further |
| 5 |  | information from the neurosurgeon regarding his cervical spine." [AR 423.] |
| 6 | 41. | No follow-up was performed with Plaintiff's neurosurgeon. |
| 7 | 42. | Standard closed Plaintiff's claim for STD benefits in a letter to Plaintiff dated October 26, |
| 8 |  | 2007.  [AR 396-99.]  Standard described the pertinent provisions of the Policy and |
| 9 |  | summarized the information in Plaintiff's file. [*Id.*]  Standard explained that based on the |
| 10 |  | information in the file, it determined that Plaintiff had the functional ability to perform his |
| 11 |  | sedentary occupation.  [AR 398.] |

Appeal and Administrative Review

|   |   |   |
|---|---|---|
| 13 | 43. | After Plaintiff's claim was closed, Plaintiff appealed Standard's decision on April 23, |
| 14 |  | 2008.  The letter to Standard requesting a review of the decision enclosed the police |
| 15 |  | report of the July 7, 2006 accident, photographs of Plaintiff's vehicle after the accident, |
| 16 |  | and over a hundred pages of additional medical information. [AR 438.] |
| 17 | 44. | The additional medical documents Plaintiff submitted contained a follow up report from |
| 18 |  | Dr. Massoudi, who reviewed Plaintiff's July 26, 2007 MRIs.  [AR 575.]  Dr. Massoudi |
| 19 |  | stated that Plaintiff's "cervical and lubosacral MRI studies did not demonstrate any |
| 20 |  | evidence of significant neural element compression." [*Id.*]   He recommended continued |
| 21 |  | conservative treatment of Plaintiff's left upper extremity. [*Id.*] |
| 22 | 45. | The additional medical documents also showed Plaintiff was treated by Dr. Timothy Chen |
| 23 |  | between September 27, 2007 to January 22, 2008 for pain management.  Dr. Chen |
| 24 |  | reviewed Plaintiff's July 26, 2007 MRI and stated that it "showed no significant |
| 25 |  | compression of spinal cord or nerve roots."  [AR 512.]  During this examination Dr. Chen |
| 26 |  | noted mild spasm and tenderness in Plaintiff's cervical paraspinal muscles, but Plaintiff's |
| 27 |  | neurological exam found no motor or sensory deficit. [*Id.*]   Dr. Chen changed Plaintiff's |
| 28 |  | medication to Diclofenac. [*Id.*] |

46. By letter dated July 2, 2008, Standard's benefits department notified Plaintiff that it did not change its decision and forwarded the claim to its Administrative Review Unit for an independent review. [AR 597-98.]

47. As part of the independent review process, the Administrative Review Unit referred Plaintiff's claim file for review by Dr. Mary Lindquist, M.D., Board Certified in Internal Medical with a medical specialty in non-surgical management of spinal disorders. [AR 653-54.] Dr. Lindquist performed a file review, including the additional medical information, and did not personally examine Plaintiff or speak to any of Plaintiff's examining physicians.

48. Dr. Lindquist's evaluation concluded that although there was some suggestion of a possible C-6 radiculopathy, the exam findings did not consistently support this diagnosis. [AR 647.] Dr. Lindquist disagreed with the conclusions drawn by some of Plaintiffs' physicians. For example, Dr. Lindquist examined the electrodiagnostic tests Dr. Mahdad performed, and questioned the conclusion that the test suggested a C-6 radiculopathy because no abnormal electrical activity was detected at the biceps musculature, which is primarily C-6 innervated. [AR 646.] According to Dr. Lindquist, Plaintiff's electrodiagnostic tests were more suggestive of left carpal tunnel syndrome. [AR 646-47.]

49. None of Plaintiffs' treating physicians, nor Dr. Mandiberg, reached a possible diagnosis of carpal tunnel syndrome.

50. Dr. Lindquist noted that "[t]he file contains extensive chart notes from the claimant's primary care team since the time of the claimant's injury through early April 2008. Most of these notes are handwritten and are largely illegible." [AR 647.]

51. Dr. Lindquist noted Plaintiff's series of cervical facet and epidural corticosteroid injections, and that Plaintiff had been managed on a modest medication regime that did not result in any noted cognitive problems. [*Id.*] Dr. Lindquist concluded that "[b]ased on the documented condition, it is reasonable to conclude that the [Plaintiff] should be capable of sedentary level work with reasonable accommodation to alternate positioning,

|   |     |   |
|---|-----|---|
| 1 |     | including sit/stand for comfort, with preclusion from work activities that entail continuous |
| 2 |     | forward bending/twisting at the neck/waist." [AR 648.] |
| 3 | 52. | The Administrative Review Unit informed Plaintiff that the denial had been affirmed in a |
| 4 |     | sixteen-page letter to Plaintiff's counsel dated July 22, 2008. [AR 627-42.]  Standard |
| 5 |     | determined that the limitations and restrictions documented in the medical records were |
| 6 |     | not sufficient to preclude Plaintiff from working in his own sedentary level occupation. |
| 7 |     | [*Id.*] |

## CONCLUSIONS OF LAW

1. This is a review of a decision by the administrator of an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sections 1001-1461.  A denial of benefits is reviewed under a *de novo* standard where the benefit plan does not give the administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan.  *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023 (9th Cir. 2008).  Where the plan does give the administrator this discretionary authority, the denial of benefits is reviewed for abuse of discretion.  *Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008).

2. As the plan at issue gave the administrator discretionary authority, the denial of benefits will be considered under the abuse of discretion standard.

3. Plaintiff has alleged that Standard has a conflict of interest that affected the denial of benefits.  Following the decision in *Abatie v. Aetna Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006), the existence of a conflict of interest is relevant to *how* the court conducts the abuse of discretion review.

4. A formal conflict of interest arises due to "an administrator's dual role as both the funding source and the administrator of the plan." *Jordan v. Northrop Grumman Corp. Welfare Benefits Plan*, 63 F. Supp. 2d 1145, 1154 (1999).

5. The Court finds that because Standard acted as both an administrator and payor for the concurrent STD and LTD plan qualification determinations, Standard had a formal conflict of interest in administering the LTD Plan.

6. Plaintiff also argues that Standard's reviewing physicians, Dr. Mandiberg and Dr. Lindquist, were biased because they were paid by Standard and were motivated to deny benefits. A court may consider evidence outside of the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir.2006). The Court has reviewed the contracts of Dr. Mandiberg and Dr. Lindquist with Standard, as well as their 1099 forms submitted by Plaintiffs. These documents do not support any particular finding of bias or conflict by the doctors.

7. While the Court may use outside evidence in a determination of conflict, in deciding the merits of the case, the reviewing court may only consider the evidence before the fiduciary at the time of the decision; in other words, it may only consider the administrative record. *See Abatie*, 458 F.3d at 970 ("a district court may review only the administrative record when considering whether the plan administrator abused its discretion").

8. Once the Court has found evidence of a formal conflict of interest, it must next examine the extent to which the conflict of interest appears to have motivated an administrator's decision. This can be done through the examination of statements made by Standard, both to the plaintiff and any other persons examining the plaintiff's claim. For instance, in *Montour v. Hartford Life & Acc. Ins. Co.*, the court discussed the plan administrator's observation of plaintiff in his daily life and how it had given a slanted report of the observations to the doctors reviewing the plaintiff's files. 582 F.3d 933, 943 (9th Cir. 2009) .

9. Where a plan administrator's bias infiltrates the entire administrative decisionmaking process, the court will "accord significant weight to the conflict." *Id.*  In this case, on August 7, 2007, when Standard denied Plaintiff's claim beyond September 5, 2007 on the

    basis that the "medical information" in Plaintiff's file did not provide Standard with documentation that the present medical condition would be disabling beyond September 5, 2007, it provided a similarly unbalanced view of the facts. It did not mention nor discuss why it did not find convincing the questionnaire submitted by Plaintiff's physician Dr. Biorkman that Plaintiff's back condition would limit him to one hour of sitting, two of standing and one of walking during an eight hour day. [AR 178.] It also did not acknowledge that Dr. Biorkman stated the anticipated return to work date was "undetermined at this time," with an estimated date of November 11, 2007. [AR 179.] At this point, Standard had not elicited any independent medical advice that would have contradicted or challenged this statement by Plaintiff's doctor. Standard appears to have completely ignored or disregarded the report by Dr. Biorkman. This failure to present a balanced review of the medical file indicates that the plan administrator's bias infiltrated the entire decisionmaking process. Therefore, the Court will therefore accord significant weight to the conflict.

10. The Court must consider, in addition to the "extent to which an administrator's conflict of interest appears to have motivated an administrator's decision," other case-specific factors that may include (1) the quality and quantity of the evidence; (2) "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records;" (3) whether the administrator provided its independent experts with all the relevant evidence; and (4) whether the administrator considered a contrary SSA disability determination. *Montour*, 582 F.2d at 940.

11. Where the plan administrator has a conflict, the fact that some medical evidence supports the administrator's decision to deny benefits is not alone sufficient for a court to affirm the decision. *Id.* at 942. Instead, the court must engage in a balancing of all pertinent factors. *Id.*

12. The parties have not brought to the Court's attention any contrary SSA disability determination, so that factor is not applicable.

13.  The second factor that the Court should consider, following the extent of a conflict of interest, is the "quality and quantity of the evidence." *Montour*, 582 F.3d at 940.

14.  As to the quality and quantity of the evidence, Standard's denial of benefits heavily relied upon the findings of its independent experts, Drs. Mandiberg and Lindquist.

15.  Dr. Mandiberg supported his finding that Plaintiff had no current limitations on working through an original review of Plaintiff's MRI scans and an evaluation of the pain medication Plaintiff was taking.  Dr. Mandiberg also focused upon the fact that Plaintiff had worked from shortly after the accident through May 15, 2007.  Plaintiff argues that Dr. Mandiberg's reliance upon the fact that Plaintiff had worked from shortly following his accident up to May 15, 2007 was improper.  A reading of the administrative record does support Plaintiff's claim that he was working at Pacific Life through significant pain because he desired to continue with his job and was in the process of seeking treatment that would improve his condition.  However, Dr. Mandiberg's reliance on the other factors of his independent medical opinion of the MRI records and his evaluation of Plaintiff's medical regimen provided some medical evidence supporting Standard's denial of benefits.

16.  Dr. Lindquist supported her finding that Plaintiff had no current limitations on working through an original review of the results of the electrodiagnostic tests performed by one of Plaitniff's physician and by an analysis of Plaintiff's modest medication regime. Plaintiff objects to the quality of the finding of Dr. Lindquist that Plaintiff only suffered from carpal tunnel syndrome, not left cervical radiculopathy, strenuously arguing that Dr. Lindquist was the only doctor who ever came to this conclusion out of all the doctors that evaluated Plaintiff.  While this is certainly true, and could potentially call into question the quality of her finding, the Court focuses on Dr. Lindquist's ultimate finding that Plaintiff was not in so much pain as to prevent him from performing his occupation.

17.  Plaintiff also argued that Standard erred by failing to discredit Plaintiff's self-reporting of pain but still denying Plaintiff's benefits. While it may sometimes be unreasonable for an administrator to reject subjective pain reported by a claimant, it is not unreasonable to

        choose to rely on other objective evidence, such as the evidence in the record regarding Plaintiff's level of pain medication or frequency of pain reduction treatments, to make independent judgments about the level of claimant's pain. *See Montour*, 582 F.3d at 944-45.

18. While Standard's decision was supported by the findings of its independent experts, Drs. Mandiberg and Lindquist, the quality of these findings is called into question by the next two factors–whether the administrator provided those experts with all the relevant evidence and whether those experts physically examined the claimant.

19. The Court next considers the factor of "whether the administrator provided its independent experts with all the relevant evidence." *Id.* at 940.

20. After Plaintiff appealed the denial, Plaintiff's file was reviewed by Dr. Mandiberg. Dr. Mandiberg indicated that follow-up should be performed with Plaintiff's neurosurgeon regarding Plaintiff's cervical spine. [AR 423.] No follow-up was performed with Plaintiff's neurosurgeon. While Standard argues that this was not actually a request for follow-up that needed to be performed in order to complete the claims, the Court finds this argument disingenuous. Dr. Mandiberg clearly stated in his evaluation that he needed "further information from the neurosurgeon" to determine a reasonable duration of impairment" and that Standard should "obtain further information from the neurosurgeon regarding his cervical spine." [AR 423.] No follow-up was performed, and Plaintiff's first appeal was denied in reliance on Dr. Mandiberg's incomplete report.

21. In the Administrative Review, Dr. Lindquist noted that "[t]he file contains extensive chart notes from the claimant's primary care team since the time of the claimant's injury through early April 2008. Most of these notes are handwritten and are largely illegible." [AR 647.] No efforts were made to supplement the record prior to her issuing her final opinion of Plaintiff's condition.

22. The Court finds that, by failing to complete the follow-up requested by Dr. Mandiberg, Standard did not provide him with all the relevant evidence he required to make a decision. In addition, by failing to supplement the record to Dr. Lindquist following her

notations that she could not read most of the notes from one of Plaintiff's primary doctors, Standard also failed to provide Dr. Lindquist with all the relevant evidence she should have had to make her decision. Having a complete file which the independent expert is able to review is particularly important when the expert does not personally examine the claimant.

23. Therefore, the factor of the provision of all relevant evidence to the independent expert weighs in favor of finding an abuse of discretion.

24. The next factor considered by the Court is "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records." *Montour*, 582 F.3d at 940. The choice to refrain from a physical exam "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Bennett v. Kemper Nat'l Services, Inc.*, 514 F.3d 547, 554 (6th Cir. 2008).

25. Both reviews performed by Dr. Mandiberg and Dr. Lindquist were paper reviews of Plaintiff's medical records. Plaintiff was never examined by a physician working for Standard. Therefore, this factor weighs in favor of finding abuse of discretion.

26. Standard's denial was tainted by Standard's conflict of interest, its failure to provide its independent experts with all of the relevant evidence, and its choice to use independent experts who did not personally examine the claimant. Weighing all of the foregoing factors together, the Court concludes that Standard abused its discretion in denying Plaintiff benefits.

27. ERISA "affords the courts a range of remedial powers . . . and returning the case to a plan administrator for further consideration is often appropriate." *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 1005 (8th Cir.2005). Where, as here, the defendant abused its discretion in making the disability determination but the court is not in the position to determine how defendant would have acted had it not engaged in the errors for which the Court finds an abuse of discretion, remand is appropriate. *See Ratkovic v. Northorp*

*Grumman Corp. Employee Welfare Ben. Plan*, No. CV 06-08255 MMM (JWJx), 2009 WL 453056, at *14 (C.D. Cal. Feb. 20, 2009).

28. Plaintiff's claim shall therefore be remanded to defendant for a new determination of Plaintiff's eligibility for LTD Plan benefits. If Plaintiff is dissatisfied with Standard's decision, he may file a new complaint, which will be related to this case.

## CONCLUSION

29. For the foregoing reasons, the Court finds that Standard abused its discretion in denying Plaintiff benefits under the LTD Plan. The Court orders Plaintiff's claim be remanded to Defendant.

30. The court will entertain motions for attorney's fees within twenty (20) days of this Order.

IT IS SO ORDERED.

DATED: November 5, 2009

_____
DAVID O. CARTER
United States District Judge